**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| U.S. DATA CORPORATION, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 CV 1092 |
| | ) | Judge Blanche M. Manning |
| REALSOURCE, INC., PRIORITY | ) | |
| DIRECT, LLC, TIMESHARE RELIEF, | ) | |
| LLC, and D&S LEADS, INC., | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

One timeshare trade association estimates that 7 million Americans own 8.3 million

intervals (typically a week's stay) at one of the more than 1,500 resorts across the country.  *See*

AMERICAN RESORT DEVELOPMENT ASSOCIATION, STATE OF THE VACATION TIMESHARE

INDUSTRY 2012 EDITION 1 (2012) (available at http://www.arda.org/uploadedFiles/ARDA/

News_and_Information/Industry_Information/2012%20state%20of%20industry%20fact%20she

et.pdf) (last visited November 19, 2012).  Despite the state of the economy, timeshare sales grew

to $6.5 billion in 2011, a 2.4% increase over 2010 sales.  *Id.* at 2.

It's little wonder, then, that the industry to direct market to those many millions of

timeshare owners is competitive.  Competition among direct marketers is what gave rise to the

events at issue in this lawsuit.  Plaintiff U.S. Data Corporation is in the business of selling lists of

timeshare owners to direct marketers.  U.S. Data operated as a middle-man, obtaining its lists

from defendant RealSource, Inc., and reselling them to former defendant Timeshare Relief, Inc.,

among others.  (All claims against Timeshare Relief were previously dismissed).  U.S. Data

contends that, with help from defendants Priority Direct, LLC and D&S Leads, Inc., RealSource

violated the parties' sales agreement by selling directly to Timeshare Relief, Inc., cutting U.S.

Data out of the equation.  In response, RealSource contends that U.S. Data took data it purchased for use with one customer, and resold it to other customers without permission and without paying RealSource.

Plaintiff U.S. Data and defendants RealSource, Priority Direct, and D&S Leads have filed cross-motions for summary judgment.  The claims on which U.S. Data seeks summary judgment are the following:  the breach of contract claim (Count I) in its complaint, and the claims for breach of contract (Count I) and misappropriation (Count IV) in the counterclaim. The claims on which the defendants seek summary judgment are the following:  the claims for breach of contract (Count I), tortious interference with prospective economic advantage (Count II), unjust enrichment (Count IV), and conspiracy (Count V) in the complaint, and the claims for breach of contract (Count I) and misappropriation (Count IV) in the counterclaim.

For the reasons that follow, the motions are resolved as follows.  For the Third Amended Complaint, U.S. Data's motion for summary judgment on Count I is denied, as is RealSource's motion; on Counts II & V, the defendants' motion for summary judgment is granted; and on Count IV, the motion for summary judgment of Priority Direct and D&S Leads is granted.  For RealSource's counterclaim, on Count I the cross-motions for summary judgment are denied; and on Count II, U.S. Data's motion for summary judgment is granted while RealSource's motion is denied.

## BACKGROUND

The following facts are undisputed except where noted.  Plaintiff U.S. Data Corporation is in the business of buying and selling customer database lists for direct mail, telemarketing, and e-mail marketing.  In August 2005, it began ordering names of timeshare owners from defendant

RealSource, Inc.  The parties executed two agreements to govern their relationship, a Pre-Screen

List Agreement, which is not at issue in this lawsuit, as well as a Non-Disclosure/Non-

Circumvent Agreement.  Under the terms of the Non-Disclosure Agreement, the parties agreed

that they would not circumvent the relationship each party had with its clients.  Specifically, the

parties agreed to the following:

> By signing this Agreement, the parties hereby mutually and
> irrevocably agree not to divulge each other's named sources and
> not to circumvent, either directly or indirectly, the relationships
> that each party has with their named sources, principals, clients,
> agents, brokers, associates, and subscribers and/or end users.
>
> Each party agrees to not contact the clients of the other party for
> any reason without written consent of the other party.  Each party
> agrees to take all the necessary precautions to insure that this does
> not happen.
>
> Should circumvention occur, in addition to other legal remedies,
> compensation equal to that paid and/or scheduled to be paid to the
> breaching party from the transaction(s) related to the breach
> committed is due and payable to the non-breaching party by the
> breaching party.

Non-Disclosure/Non-Circumvent Agreement (attached as Exhibit A to the Third Amended

Complaint [122-1]) ¶ 9.  The agreement also contained the following terms:

> Either party may terminate this Agreement by providing written
> notice to the other.
>
> . . .
>
> If any portion of this Agreement is held to be invalid or
> unenforceable for any reason, the remaining provisions will
> continue in full force without being impaired or invalidated in any
> way.  The parties agree that any such invalid provision shall be
> replaced with a valid provision which most closely approximates
> the intent and economic effect of the invalid provision.

*Id.* ¶ 10(d), (g).

Pursuant to those agreements, U.S. Data ordered timeshare data from RealSource. Each order was initiated by a List Order Acknowledgment, and each List Order Acknowledgment contained the following term:

> This order is for a one time rental and any other resale of the file will need to be paid by the client.

*See, e.g.*, List Order Acknowledgment dated April 19, 2007 [185-1 Page ID#2066]. After obtaining the data ordered from RealSource, U.S. Data then sold the timeshare data to its client, Timeshare Relief, Inc.

U.S. Data's purchases from RealSource continued uneventfully until around March 2007. At that time, U.S. Data placed an order with RealSource for all timeshare names not previously ordered by U.S. Data, which amounted to 526,750 names. After that order, U.S. Data's purchases of data from RealSource began to drop and stopped completely in August 2007.

The events surrounding the drop in orders by U.S. Data are mostly in dispute. The parties agree only that beginning at least in May 2007, U.S. Data filled orders for timeshare data from its own in-house timeshare database that it had created. But the parties do not agree on the origins of that in-house database. U.S. Data contends that it created its own database of timeshare owners beginning in August 2006 with its purchase of 1.3 million names from Todd Davis who, at the time, was a member of Revenue Channels, LLC, followed by its purchase of 1.8 million names from Wright Direct in May 2007.

RealSource disputes U.S. Data's account. It contends that U.S. Data's database was merely a copy of RealSource's database, which U.S. Data created by retaining and then merging all of the data it had purchased from RealSource over the years, all in violation of the one-time rental provision of the List Order Acknowledgment. It contends that U.S. Data's replication of

RealSource's database culminated in March 2007, when U.S. Data ordered from RealSource all of the timeshare names it had not previously ordered. In support, U.S. Data relies on deposition testimony from Nichole Short List and Laura Acord, former U.S. Data employees who testified that they were directed to merge the RealSource data into a single database for U.S. Data's use.

In May 2007, List contacted RealSource Chief Executive Officer Trenton Martin to tell him that U.S. Data was misusing RealSource's data. On September 7, 2007, RealSource sent U.S. Data a Notice of Termination pursuant to the terms of the Non-Disclosure Agreement. *See* Exhibit D to the Third Amended Complaint [122-1] ("Please consider this letter as notice of termination pursuant to the NDA.").

RealSource contends that it terminated the agreement because U.S. Data had breached the List Order Acknowledgments by reusing timeshare data. U.S. Data denies any wrongdoing, and contends that the real reason RealSource terminated the Non-Disclosure Agreement was to allow RealSource to sell data directly to U.S. Data's client, Timeshare Relief. RealSource first acknowledged knowing that Timeshare Relief was one of U.S. Data's clients in an e-mail dated July 17, 2006. RealSource again acknowledged knowing that Timeshare Relief was a client when one of RealSource's owners, Karolyn Tincher, sent an e-mail on June 25, 2007, to U.S. Data president Jeff Herdzina asking if Timeshare Relief was U.S. Data's largest client. Herdzina responded affirmatively.

According to U.S. Data, once RealSource knew about Timeshare Relief, it sought to cut out U.S. Data as a middleman and sell directly to Timeshare Relief. To that end, U.S. Data contends that RealSource not only terminated the Non-Disclosure Agreement, but also began to steer Timeshare Relief away from U.S. Data. Indeed, in or around the late summer of 2007 the

volume of orders Timeshare Relief placed with U.S. Data began to drop, although it's not clear from the record what precipitated the drop. Around that same time, Jeff Herdzina of U.S. Data asked Trent Martin of RealSource if RealSource had been in contact with Timeshare Relief, which Martin denied. Then in October 2007, RealSource president Martin told both Mark Welch, the sole member of Priority Direct, LLC, and David MacMillan, one of the owners of Timeshare Relief, that U.S. Data had stolen RealSource's timeshare database. Welch also told MacMillan about his conversation with Martin.

As a result of the information received from both Martin and Welch, on October 23, 2007, Timeshare Relief placed its last order with U.S. Data. Rather than order from U.S. Data, Timeshare Relief continued ordering data from another middleman for RealSource, D&S Leads, from which it had first ordered in August 2007. RealSource knew that the data it sold D&S Leads was for Timeshare Relief. Then in January 2008, Timeshare Relief cut out all middlemen and began to order directly from RealSource.

RealSource's belief that U.S. Data stole its database, and U.S. Data's belief that RealSource interfered with its relationship with Timeshare Relief, has spawned numerous claims between the parties. In the Third Amended Complaint, U.S. Data brings the following remaining claims[1]: (1) a claim for breach of contract against RealSource based on allegations that RealSource stole its client, Timeshare Relief, in violation of the Non-Disclosure Agreement (Count I); (2) a claim for tortious interference with prospective economic advantage against RealSource, Priority Direct, and D&S Leads for depriving it of future business with Timeshare

_____

[1]U.S. Data earlier voluntarily dismissed defendant Timeshare Relief, and along with it the claim against it for conversion (Count VI). *See* Docket Entry # 150.

Relief; (3) a claim of conversation against RealSource, Priority Direct, and D&S Leads (Count III), (4) a claim of unjust enrichment against Priority Direct and D&S Leads (Count IV), and (5) a claim of conspiracy to tortious interference with prospective economic advantage against RealSource, Priority Direct, and D&S Leads (Count V).

In response, RealSource filed an amended counterclaim against U.S. Data in which it brings the following claims: (1) a claim for breach of contract based on allegations that U.S. Data reused RealSource's data in violation of the List Order Acknowledgments (Count I); and (2) a claim of misappropriation/unfair competition stemming from the same allegations of reusing RealSource's data (Count II).

Before the court are the parties' cross motions for summary judgment. In its motion, U.S. Data seeks summary judgment on the following claims: (1) its breach of contract claim against RealSource (Count I of the Third Amended Complaint); (2) RealSource's breach of contract claim against it (Count I of the Amended Counterclaim); and (3) RealSource's misappropriation/unfair competition claim against it (Count IV of the Amended Counterclaim). Meanwhile, the defendants seek summary judgment on the following claims against U.S. Data: (1) RealSource seeks judgment on the breach of contract claim against it (Count I of the Third Amended Complaint); (2) RealSource, D&S Listing, and Priority Direct seek judgment on the tortious interference with prospective economic advantage claim against them (Count II of the Third Amended Complaint); (3) D&S Listing and Priority Direct seek judgment on the unjust enrichment claim against them (Count IV of the Third Amended Complaint); (4) RealSource, D&S Listing, and Priority Direct seek judgment on the conspiracy claim against them (Count V of the Third Amended Complaint); (5) RealSource seeks judgment on its breach of contract

claim against U.S. Data (Count I of Amended Counterclaim); and (6) RealSource seeks judgment on its misappropriation-unfair competition claim against U.S. Data (Count IV of the Amended Counterclaim).

## ANALYSIS

### I.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Moreover, a court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *See Valenti*, 970 F.2d at 365; *see also Anderson*, 477 U.S. at 248.

Thus, in order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a genuine issue of material fact exists. *See Anderson*, 477 U.S. at 248. The nonmoving party may not merely rest upon the allegations or details in his pleading, but instead, must set forth specific facts showing there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

## II.  U.S. DATA'S MOTION FOR SUMMARY JUDGMENT [178-1]

### A.  Breach of Non-Disclosure/Non-Circumvent Agreement (Count I of Third Amended Complaint)

The court begins with U.S. Data's motion for summary judgment on its breach of contract claim against RealSource, found in Count I of the Third Amended Complaint.  In that claim, U.S. Data alleges that RealSource violated the parties' Non-Disclosure/Non-Circumvent Agreement by indirectly circumventing its relationship with Timeshare Relief.  U.S. Data asserts that it is entitled to summary judgment on that claim because RealSource sold data to D&S Leads knowing that D&S Leads was ordering it for Timeshare Relief, and that the Non-Disclosure/Non-Circumvent Agreement prohibited such indirect circumvention.  RealSource does not dispute that on September 29, 2007, before it terminated the Non-Disclosure/Non-Circumvent Agreement, it filled an order for data placed by D&S Leads knowing that the data was destined for Timeshare Relief, and knowing that Timeshare Relief was a client of U.S. Data.  However, RealSource nevertheless opposes the motion for summary judgment on several grounds:  (1) the Non-Disclosure/Non-Circumvent Agreement prohibited circumvention only through direct contact with Timeshare Relief; (2) the non-circumvention provision is an unreasonable restrictive covenant and, therefore, unenforceable; and (3) U.S. Data materially breached its obligations under the parties' agreements first and, therefore, cannot enforce the Non-Disclosure/Non-Circumvent Agreement.

### 1.  Direct Circumvention

As discussed above, the Non-Disclosure/Non-Circumvent Agreement includes the following terms:

### 9.  NON-CIRCUMVENTION

By signing this Agreement, the parties hereby mutually and irrevocably agree not to divulge each other's named sources and not to circumvent, either directly or indirectly, the relationships that each party has with their named sources, principals, clients, agents, brokers, associates, and subscribers and/or end users.

Each party agrees to not contact the clients of the other party for any reason without written consent of the other party. Each party agrees to take all the necessary precautions to insure that this does not happen.

. . .

**10. GENERAL PROVISIONS**

. . .

(d) Either party may terminate this Agreement by providing written notice to the other.

Non-Disclosure/Non-Circumvent Agreement (attached as Exhibit A to the Third Amended Complaint [122-1]) ¶¶ 9, 10(d). Because U.S. Data contends that RealSource breached its obligations under that agreement, the court first examines what RealSource's obligations were.

Under the Non-Disclosure/Non-Circumvent Agreement, RealSource was obligated "not to circumvent, either directly or indirectly, the relationships that each party has with their . . . clients." *Id.* ¶ 9. RealSource contends that the obligation not to circumvent in the first sentence of paragraph 9 must be read in conjunction with the second sentence of that paragraph under which "[e]ach party agrees to not contact the clients of the other party for any reason without written consent of the other party." *Id.*. Under RealSource's interpretation, when read in tandem, the quoted language prohibits RealSource from circumventing the relationship between U.S. Data and its clients, but only by directly contacting that client without written consent.

In construing the terms of the parties' agreements, the court will apply Illinois law, the only state's law cited by the parties. Under Illinois law, the unambiguous terms of a contract are construed by the court as a matter of law. *See Gassner v. Raynor Mfg. Co.*, 948 N.E.2d 315, 326 (Ill. App. Ct. 2011). A contract must be construed as a whole, giving effect to all of its terms. *See Clinton Imperial China, Inc. v. Lippert Marketing, Ltd.*, 878 N.E.2d 730, 738 (Ill. App. Ct. 2007). According to RealSource, the application of that principle requires that the Non-Disclosure/Non-Circumvent Agreement's prohibition on directly contacting the other party's clients merely serves as a limitation on the language that otherwise prohibits circumventing the other party's relationships with its clients. Under RealSource's interpretation, although the first sentence of paragraph 9 initially prohibits both direct and indirect circumvention, the language in the second sentence clarifies that only direct contact is prohibited.

The language of the contract does not support RealSource's interpretation. The first sentence concerns direct and indirect *circumvention*, while the second sentence concerns direct *contact*. Thus, the sentences impose separate obligations on the parties, and nothing in the second sentence can be read as serving as a limitation on the first sentence, as opposed to creating a separate obligation. Moreover, interpreting the second sentence as prohibiting only circumvention through direct contact would render superfluous the first sentence's prohibition on circumvention through indirect means. Contracts must not be construed in a way that makes any of the terms superfluous. *See Salce v. Saracco*, 949 N.E.2d 284, 289 (Ill. App. Ct. 2011). Accordingly, RealSource's construction does not comport with the tenants of contract interpretation.

## 2. Unenforceable Restrictive Covenant

Alternatively, RealSource argues that the non-circumvention provisions of the Non-Disclosure/Non-Circumvent Agreement constitute an unreasonable restrictive covenant and, therefore, are unenforceable. In support, it cites to cases in which courts held that covenants restricting an employee's ability to compete with his former employer will be upheld only if they are reasonable. *See, e.g., Reliable Fire Equipment Co. v. Arredondo*, 965 N.E.2d 393, 396-97 (Ill. 2012) (post-employment restrictions will be upheld if they are reasonable restraints and are supported by consideration). "A restrictive covenant, assuming it is ancillary to a valid employment relationship, is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Id.* at 396. In addition, the extent of the employer's legitimate business interest is restricted by type of activity, geographic area, and time. *Id.* at 397.

The cases on which RealSource relies are inapposite because they involve restrictions on former employees, and the requirement that such restrictions be reasonable so as not to prevent the former employee from obtaining gainful employment. *See, e.g., Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l, Inc.*, 616 F. Supp. 2d 805, 817-18 (N.D. Ill. 2009) (analyzing post-employment restrictions); *Eichmann v. Nat'l Hosp. & Health Care Services, Inc.*, 719 N.E.2d 1141, 1148 (Ill. App. Ct. 1999) (same). The relationship between U.S. Data and RealSource is not one of employer-employee, and RealSource has cited no authority that the protections afforded former employees should also be extended to sophisticated corporations dealing with each other at arms-length. Moreover, U.S. Data's claim involves RealSource's

conduct during the time the Non-Disclosure/Non-Circumvent Agreement was in effect, further distinguishing the cases cited by RealSource involving *former* rather than *current* employees. *See* Reply [189-1] at 5 (the instant case involves "two companies of equal sophistication in the marketplace mutually and irrevocably agree[ing] not to circumvent each other's business interest *while an agreement is in place*.") (emphasis added).

In any event, even if a non-circumvention agreement between corporations was subject to the type of test for reasonableness that post-employment covenants not to compete must meet, the parties' non-circumvention agreement would meet such a test. Because U.S. Data's claim is based only on RealSource's alleged circumvention while the Non-Disclosure/Non-Circumvent Agreement was in place, the restriction was temporally limited, protected U.S. Data's legitimate business interest in preventing RealSource from interfering with its relationship with clients, and did not impose an undue hardship on RealSource, which was still able to sell its data. In addition, RealSource has identified no injury that the public would suffer from the non-circumvention agreement.

In summary, RealSource has provided no support for its position that the parties' agreement not to directly or indirectly circumvent the others' relationship with its clients is unenforceable.

3. **U.S. Data Breached the Parties' Agreement and Therefore Cannot Enforce the Non-Disclosure/Non-Circumvent Agreement**

RealSource also argues that when U.S. Data breached the List Order Acknowledgments by reusing data, RealSource was released from all of its contractual obligations, such as the obligation not to circumvent in the Non-Disclosure/Non-Circumvent Agreement. Therefore,

RealSource argues, U.S. Data is not entitled to summary judgment on its claim under that agreement.

As an initial matter, the court notes that U.S. Data's alleged breach involved the List Order Acknowledgment agreements, while the non-circumvention provisions were in the Non-Disclosure/Non-Circumvent Agreement. However, separate contracts executed by the same parties as part of the same transaction may be viewed collectively as a single agreement, depending on the intent of the parties. *See Int'l Supply Co. v. Campbell*, 907 N.E.2d 478, 486 (Ill. App. Ct. 2009). The parties have not addressed the issue either by identifying relevant evidence of the parties' intent on whether the agreements be construed as one, or by citing any pertinent authority on the issue. Since the present record does not support ruling out the possibility that the List Order Acknowledgments and Non-Disclosure/Non-Circumvent Agreements could be viewed as a single agreement, for purposes of the motion for summary judgment that the court will assume (without deciding) that they could be viewed as a single agreement.

One party's breach of the terms of an agreement may serve as grounds for releasing the other party from its obligations under that agreement. *See William Blair & Co. v. FI Liquidation Corp.*, 830 N.E.2d 760, 779 (Ill. App. Ct. 2005). However, the initial breach must be a material one. *Id.* Neither the List Order Acknowledgments or the Non-Disclosure/Non-Circumvent Agreement define what constitutes a material breach and, therefore, the determination of what constitutes a material breach is a question of fact. *Id.*

In addition, whether U.S. Data breached the List Order Acknowledgments is a disputed question of fact. As addressed in greater detail below in the discussion of Count I of the

Amended Counterclaim, RealSource has presented evidence from former U.S. Data employees Nicole Short List and Laura Accord, who described their work creating a database of the names of timeshare owners by reusing data obtained from RealSource, and then filling orders for data from that database. On the other hand, U.S. Data has presented evidence that the database it created consisted not of data obtained from RealSource, but rather purchased from Revenue Channels, LLC and Wright Direct.

Because a factfinder must determine (1) whether U.S. Data breached the List Order Acknowledgments by reusing RealSource data, and (2) whether such a breach would be material, disputed questions of fact prevent the court from resolving whether a breach by U.S. Data excused RealSource from its obligations under the Non-Disclosure/Non-Circumvent Agreement from indirectly circumventing U.S. Data's relationship with Timeshare Relief.

As a result, whether RealSource breached the Non-Disclosure/Non-Circumvent Agreement depends on the resolution of disputed questions of fact, precluding the granting of summary judgment on Count I of U.S. Data's Third Amended Complaint. Therefore, the motion for summary judgment on that count is denied.

## B. Breach of List Order Acknowledgments (Count I of Amended Counterclaim)

Next, U.S. Data seeks summary judgment on Count I of RealSource's Amended Counterclaim, in which RealSource alleges that U.S. Data breached the List Order Acknowledgments by using data more than once. As discussed earlier, U.S. Data purchased data from RealSource pursuant to the terms of a List Order Acknowledgment. Each List Order Acknowledgment included the following term:

> This order is for a one time rental and any other resale of the file
> will need to be paid by the client.

*See, e.g.*, List Order Acknowledgment dated April 19, 2007 [185-1 Page ID#2066].

In support of its motion for summary judgment, U.S. Data contends that RealSource has identified no admissible evidence that U.S. Data ever reused data purchased under a List Order Acknowledgment. To the contrary, U.S. Data contends, the evidence establishes that its database was compiled with data it purchased from Revenue Channels, LLC in August 2006 (1.3 million names) and from Wright Direct in May 2007 (1.8 million names).

In response, RealSource points to evidence that it contends supports its claim. Specifcially, it points to affidavits and deposition testimony from Nichole Short List and Laura Acord in which the former U.S. Data employees affirmed that, under the direction of two other persons at U.S. Data, president Jeff Herdzina and account representative Jeff Peterman, they compiled a database of all data previously purchased from RealSource, and that U.S. Data subsequently fulfilled orders from that database during the period March 2007 through at least March 2008.

U.S. Data argues that RealSource's evidence is insufficient to defeat its motion for summary judgment because List and Acord were in no position to know the source of U.S. Data's database. But List and Acord have stated that they were the persons who compiled the database created from RealSource's data. They have also stated that they were the employees who filled clients' orders for data by contacting outside suppliers like RealSource, until U.S. Data had finished its replication of RealSource's database, obviating the need to continue purchasing data from outside suppliers. Because List and Acord purport to have personal knowledge of the facts to which they have testified, their testimony is sufficient to allow

RealSource to withstand summary judgment. *See Zboralski v. Sanders,* No. 06 CV 3772, 2010 WL 3024885, at *5 (N.D. Ill. Jul. 29, 2010).

Because of the disputed questions of fact, U.S. Data's motion for summary judgment on Count I of the Amended Counterclaim is denied.

### C.      Misappropriation (Count II of Amended Counterclaim)

Finally, U.S. Data seeks summary judgment on Count II of the Amended Counterclaim, in which RealSource alleges that U.S. Data unfairly competed by misappropriating the data it purchased from RealSource through its multiple use of the data.  Illinois law on misappropriation is taken from New York law.  *See Chicago Bd. Options Exchange, Inc. v. International Securities Exchange, L.L.C.*, 973 N.E.2d 390, 404-05 (Ill. App. Ct. 2012) (noting that New York is the source of Illinois law on misappropriation, and Illinois courts look to the decisions of New York courts when discussing the doctrine of misappropriation).  A claim of misappropriation as a form of unfair competition requires that each of the following elements be satisfied:  "(1) the plaintiff generates or collects information at some cost or expense; (2) the value of the information is highly time-sensitive; (3) the defendant's use of the information constitutes free-riding on the plaintiff's costly efforts to generate or collect it; (4) the defendant's use of the information is in direct competition with a product or service offered by the plaintiff; and (5) the ability of other parties to free-ride on the efforts of the plaintiff would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened."  *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 852 (2d Cir. 1997) (applying New York law).

U.S. Data argues that it is entitled to summary judgment on RealSource's misappropriation claim because the claim is precluded by Illinois' economic loss doctrine. Under the economic loss doctrine, "claims which allege only injury to economic interests may proceed only in contract—not in both contract and tort." *Sencon Sys., Inc. v. W.R. Bonsal Co.*, No. 85 CV 8250, 1988 WL 33842, at *4 (N.D. Ill. Apr. 6, 1988). In *Sencon*, the court acknowledged that the economic loss doctrine "did not eliminate the tort of unfair competition," and that "where no contractual provision exists governing the confidentiality of proprietary information, tort theories of recovery remain viable." *Id.* However, it held that where the parties had agreed in their contract to prohibit the conduct at issue, the parties' recourse lies in contract, not tort, law. *Id.*; *see also Future Tech Int'l, Inc. v. Tae Il Media, Ltd.*, 944 F. Supp. 1538, 1569 (S.D. Fla. 1996) (under the economic loss doctrine, "where a claim for civil theft is 'exactly coextensive with the nonperformance of an agreement between the parties,' such a claim may not stand").

RealSource's misappropriation claim arises out of the same conduct that is the subject of its breach of contract claim: U.S. Data's purported reuse of data in violation of the List Order Acknowledgments. As a result, RealSource's recourse is to sue for breach of contract, not to also sue for a separate tort claim. Nevertheless, RealSource argues that the economic loss doctrine does not bar tort claims "when the very purpose of the tort is to protect against economic loss," which RealSource contends is the case with its claim for misappropriation. Response [187-1] at 14. In support, it cites to *Board of Trade of City of Chicago v. Dow Jones & Co.*, 456 N.E.2d 84, 89 (Ill. 1983) and *Capitol Records, Inc. v. Spies*, 264 N.E.2d 874, 877 (Ill. App. Ct. 1970), in which courts allowed claims of unfair competition premised on

misappropriation to proceed.  However, in neither case did the parties have a contractual relationship that prohibited the alleged misappropriation.  Accordingly, the cases do not advance RealSource's argument that the tort of misappropriation is not subject to the economic loss doctrine.

Because RealSource's misappropriation claim is coextensive with its breach of contract claim, the claim is barred by the economic loss doctrine.  Accordingly, U.S. Data's motion for summary judgment on Count II of RealSource's Amended Counterclaim is granted, and judgment is entered in U.S. Data's favor.

## III.  MOTION FOR SUMMARY JUDGMENT OF REALSOURCE, PRIORITY DIRECT, and D&S LEADS [181-1]

### A.  Breach of Non-Disclosure/Non-Circumvent Agreement (Count I of Third Amended Complaint)

RealSource moves for summary judgment on Count I of U.S. Data's Third Amended Complaint, in which U.S. Data alleged that RealSource breached the non-circumvention provision of the Non-Disclosure/Non-Circumvent Agreement by selling indirectly to U.S. Data's client, Timeshare Relief.

As discussed in section II(A), the resolution of whether RealSource breached the Non-Disclosure/Non-Circumvent Agreement, and whether it can assert a defense that excuses any breach, turns on disputed questions of fact.  Accordingly, for the same reasons that U.S. Data's motion for summary judgment on this claim was denied, RealSource's motion is also denied.

### B.  Tortious Interference with Prospective Economic Advantage (Count II of Third Amended Complaint)

Defendants RealSource, Priority Direct, and D&S Leads move for summary judgment on Count II, in which U.S. Data alleges that these defendants tortiously interfered with U.S. Data's

expectation of continued business from Timeshare Relief.  The defendants argue that they are entitled to summary judgment on the claim because U.S. Data cannot satisfy the required elements.

To succeed on a claim of tortious interference with prospective economic advantage, a plaintiff must establish each of the following elements:  (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) purporseful interference by the defendant that induced or caused a breach or termination of the expectancy; and (4) damage to the plaintiff resulting from the defendant's interference.  *See Voyles v. Sandia Mortgage Corp.*, 751 N.E.2d 1126, 1133-34 (Ill. 2001).

U.S. Data contends that it has identified evidence to satisfy each of the required elements. For instance, it argues that evidence that its business relationship with Timeshare Relief dated back two years establishes the reasonableness of its expectation of additional business but for the defendants' alleged interference.  The entirety of U.S. Data's discussion of the issue consists of the following:

> First, U.S. Data obviously had a reasonable expectancy of entering into a valid business relationship with TSR [Timeshare Relief]—U.S. data had maintained a successful, ongoing relationship with TSR for almost two years prior to RealSource's interference in late summer 2007.  While David MacMillan [of Timeshare Relief] did testify he no longer wanted to use brokers of data as of mid-2009, at the time the relationship was circumvented by Defendants that was not the case.

Response [183-1] at 11.  However, a history of filling orders for a particular customer does not, by itself, satisfy the requirement of establishing a reasonable expectancy of receiving additional orders from that customer.  *See Automated Concepts, Inc. v. Weaver*, No. 99 CV 7599, 2000 WL 1134541, at *7 (N.D. Ill. Aug. 9, 2000). ("The fact that ACI has a "track record" of receiving

work from a particular customer in the past, in and of itself, does not establish a reasonable expectation of ACI's entering into any particular future business relationship with such a customer."); *Int'l Serv. Assocs., Inc. v. Arco Management*, No. 94 CV 1807, 1994 WL 583302, at *7 (N.D. Ill. Oct. 21, 1994) ("First, a 'track record' of HUD awarding contracts to ISA, standing alone, does not establish a reasonable expectation of ISA's entering into any particular future business relationship with HUD.").

Thus, U.S. Data's track record with Timeshare Relief alone does not establish a reasonable expectancy of continuing business. Additionally, it is undisputed that "[t]hroughout the entire time that TSR rented data from U.S. Data, TSR also rented timeshare data from other sources, including up to eight or nine different vendors." Responses to Statements of Additional Facts [190-1] ¶ 17. The fact that Timeshare Relief dealt with so many other vendors does nothing to advance U.S. Data's contention that its expectation of continued business was reasonable.

Given that a track record alone does not establish a reasonable expectancy of additional business, and because U.S. Data has identified no other evidence of the reasonableness of its expectancy, it has failed to identify evidence satisfying a required element of a claim of tortious interference with prospective economic advantage. Accordingly, the motion for summary judgment on that claim is granted, and judgment is entered in the defendants' favor on Count II of the Third Amended Complaint.

### C.     Unjust Enrichment (Count IV of the Third Amended Complaint)

Next, defendants Priority Direct and D&S Leads seek summary judgment on the unjust enrichment claim against them (Count IV of the Third Amended Complaint).  In that claim, U.S. Data alleges that Priority Direct and D&S Leads both "utilized customer database information received from RealSource" and used it in direct mail campaigns for Timeshare Relief, despite the fact that they knew that Timeshare Relief was a customer of U.S. Data.

To establish unjust enrichment, a plaintiff must show that (1) "the defendant has unjustly retained a benefit to the plaintiff's detriment," and (2) the "defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989).  In addition, where the benefit came from a third party, the plaintiff must also show that:  "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant."  *Id.* U.S. Data attempts to satisfy the second factor by showing that Priority Direct and D&S Leads procured the benefit of Timeshare Relief's business through wrongful conduct.

Priority Direct and D&S Leads argue that they are entitled to summary judgment because there is no evidence of wrongful conduct.  Specifically, they argue that "there is no contractual or legal basis for claiming that Priority Direct and [D&S Leads] could not do business directly with TSR.  After all, Priority Direct's relationship with [Timeshare Relief] predated U.S. Data's . . ."  Memorandum in Support [182-1] at 12.  U.S. Data responds only briefly, and only by pointing out that there are disputed questions of fact about whether Priority Direct and D&S

Leads dealt directly with Timeshare Relief after "cutting U.S. Data out of the equation." Response [183-1] at 13.

Even assuming that the factual disputes are resolved in U.S. Data's favor and the evidence shows that Priority Direct and D&S Leads did deal directly with Timeshare Relief, U.S. Data fails to present any argument that the conduct was wrongful. By asserting only that disputed questions of fact preclude summary judgment, without explaining how any of the disputes, if resolved in its favor, would satisfy the elements of unjust enrichment, U.S. Data has forfeited any argument that the defendants are not entitled to summary judgment. *See Day v. River Forest School Dist., et al.,* No. 10 CV 4426, 2011 WL 4585555, at *2 (N.D. Ill. Sept. 29, 2011) (undeveloped arguments unsupported by citations to authority are forfeited). Furthermore, it is difficult to discern from the record any basis for concluding that Priority Direct and D&S Leads wrongfully pursued business from Timeshare Relief, especially given the discussion above about U.S. Data's lack of a reasonable expectation of continued business from Timeshare Relief.

Accordingly, the motion brought by Priority Direct and D&S Leads for summary judgment on the claim for unjust enrichment is granted, and judgment is entered in favor of Priority Direct and D&S Leads on Count IV of the Third Amended Complaint.

**D.      Civil Conspiracy (Count V of the Third Amended Complaint)**

The defendants also seek summary judgment on U.S. Data's claim for conspiracy to tortiously interfere with its prospective economic advantage (Count I of the Third Amended Complaint). In that count, U.S. Data alleges that the defendants conspired to "eliminate US Data

from the supply chain so that [Timeshare Relief] could deal directly with RealSource and [D&S Leads] to obtain better pricing." Third Amended Complaint [122-1] at 13.

Under Illinois law, to properly allege a claim of civil conspiracy, the plaintiff must establish each of the required elements: (1) an agreement between two or more persons to accomplish either an unlawful purpose or a lawful purpose by an unlawful means; and (2) at least one tortious act by at least one of the conspirators in furtherance of the agreement. *See Johnson v. Dossey*, — F. Supp. 2d —, No. 06 CV 787, 2012 WL 1080123, at *9 (N.D. Ill. Mar. 30, 2012). However, if the plaintiff fails to establish the underlying tortious act, then the conspiracy claim also fails. *See Jones v. City of Chicago*, No. 08 CV 3501, 2011 WL 1898243, at *6 (N.D. Ill. May 18, 2011).

As discussed above in section III(B), U.S. Data has not identified evidence that it had a reasonable expectation of continued business with Timeshare Relief and, for that reason, cannot establish tortious interference with prospective economic advantage. Because that is the tort at the heart of the civil conspiracy claim, U.S. Data also cannot establish the conspiracy claim. *See id.* Accordingly, the motion for summary judgment on the claim is granted, and the defendants are entitled to judgment in their favor on Count V of the Third Amended Complaint.

**E.        Breach of List Order Acknowledgments (Count I of Amended Counterclaim)**

Defendant RealSource seeks judgment on its claim that U.S. Data breached the List Order Acknowledgments by reselling data. The court previously denied U.S. Data's motion for summary judgment on this claim because the court found that RealSource had identified evidence to support the claim, namely, statements by former U.S. Data employees Nicole Short

List and Laura Acord that they had replicated RealSource's database and filled orders from that database.

RealSource now contends that it is entitled to judgment on the claim because U.S. Data has failed to identify any evidence to dispute the statements by Short and Acord. In response, U.S. Data contends that the evidence establishes that it created its database not by replicating U.S. Data's but, rather, by purchasing data from Revenue Channels, LLC in August 2006 (1.3 million names) and from Wright Direct in May 2007 (1.8 million names).

RealSource argues that U.S. Data's evidence is insufficient to withstand summary judgment because it is not consistent with statements made by Nicole Short List about the origins and size of the database U.S. Data compiled. However, it is these inconsistencies that preclude the grant of summary judgment because, as detailed above in section II(B), they must be resolved by jurors, not the court.

Accordingly, as with U.S. Data's motion on this claim, RealSource's motion for summary judgment on Count I of its Amended Counterclaim is denied.

F.     **Misappropriation (Count II of Amended Counterclaim)**

As detailed in section II(C), RealSource's claim of misappropriation is barred by the economic loss doctrine. As a result, the court granted judgment in U.S. Data's favor on the claim, and RealSource's motion for summary judgment in its favor on Count II of the Amended Counterclaim is denied.

**CONCLUSION**

U.S. Data's Motion for Summary Judgment [178-1] is granted in part and denied in part as follows: the motion is denied as to Count I of the Third Amended Complaint, denied as to

Count I of the Amended Counterclaim, and granted as to Count II of the Amended Counterclaim. Judgment is entered in favor of U.S. Data on Count II of the Amended Counterclaim.

The Defendants' Motion for Summary Judgment [181-1] is granted in part and denied in part as follows: the motion is denied as to Counts I of the Third Amended Complaint, granted as to Counts II, IV, and V of the Third Amended Complaint, and denied as to Counts I and II of the Amended Counterclaim. Judgment is entered in favor of all defendants on Counts II and V of the Third Amended Complaint, and in favor of defendants Priority Direct and D&S Leads on Count IV of the Third Amended Complaint.

The parties shall file a joint status report by November 30, 2012, containing their views on how the parties and court should proceed on the remaining claims.

ENTER:

DATE: November 19, 2012

Blanche M. Manning
United States District Judge