# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| U.S. DATA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 C 1092 |
| | ) | |
| v. | ) | |
| | ) | Judge Amy J. St. Eve |
| REALSOURCE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

In September 2013, Plaintiff U.S. Data Corp. ("U.S. Data") and Defendant RealSource, Inc. ("RealSource") went to trial on the two claims that survived summary judgment in this case: U.S. Data's breach of contract claim that RealSource breached a Non-Disclosure/Non-Circumvent Agreement ("NDA"), and RealSource's breach of contract counterclaim that U.S. Data breached a series of List Order Acknowledgement Agreements ("LOA"). On September 24, 2013, following a trial of approximately one week, the jury returned a verdict in favor of RealSource on U.S. Data's claim and in favor of U.S. Data on RealSource's counterclaim. (R. 274.) The Court entered judgment on both claims on September 24, 2013. (R. 275.) Before the Court are the parties' motions for a new trial. U.S. Data moves the Court for judgment notwithstanding the verdict or, in the alternative, a new trial as to Count I of its Third Amended Complaint. (R. 278.) RealSource moves for a new trial on its counterclaim. (R. 276.) For the following reasons, the Court denies both parties' motions.

# BACKGROUND[1]

This breach of contract case involves the sale of lists of timeshare owners. Plaintiff U.S. Data buys and sells customer database lists of timeshare owners for direct mail, telemarketing, and e-mail marketing purposes. In August 2005, U.S. Data began ordering names of timeshare owners from RealSource. The parties executed a Non-Disclosure/Non-Circumvent Agreement ("NDA") to govern their relationship. As part of the terms of the NDA, the parties agreed that:

> By signing this Agreement, the parties hereby mutually and irrevocably agree not to divulge each other's named sources and not to circumvent, either directly or indirectly, the relationships that each party has with their named sources, principals, clients, agents, brokers, associates, and subscribers and/or end users.
>
> Each party agrees to not contact the clients of the other party for any reason without written consent of the other party. Each party agrees to take all the necessary precautions to insure that this does not happen.
>
> Should circumvention occur, in addition to other legal remedies, compensation equal to that paid and/or scheduled to be paid by the breaching party from the transaction(s) related to the breach committed is due and payable to the non-breaching party by the breaching party.

(Pl. Ex. 1, Non-Disclosure/Non-Circumvent Agreement § 9.) The NDA also contained an "Obligation of Confidentiality" that provided:

> The Recipient will use the same care and discretion to avoid disclosure, publication or dissemination of information as it uses with its own similar information that it does not wish to disclose, publish or disseminate. The Recipient may use information solely for the purposes of this agreement.

(*Id*, § 2.) Pursuant to the NDA, U.S. Data ordered timeshare data from RealSource. A List Order Acknowledgement ("LOA") initiated each order, and each LOA contained the following term: "[t]his order is for a one time rental and any other resale of the file will need to be paid by

---

[1] The Court assumes familiarity with the factual background of this case, a summary of which can be found in the Court's summary judgment memorandum opinion and order. *See U.S. Data Corp. v. RealSource, Inc.*, 910 F. Supp. 2d 1096 (N.D. Ill. 2012) (J. Manning). The Executive Committee ordered the Clerk's Office to transfer this case to the Court from Judge Manning after she ruled on the parties' motions for summary judgment. (R. 199.)

the client." (Pl. Ex. 2, 8/29/07 LOA.) After obtaining the data from RealSource, U.S. Data then sold it to its client, Timeshare Relief, Inc.

In March 2007, U.S. Data placed an order with RealSource for all timeshare names that it had not previously ordered, which amounted to 526,750 names. After that order, U.S. Data's purchases of data from RealSource began to drop and stopped completely in August 2007. The events surrounding the drop in orders by U.S. Data remain mostly in dispute. The parties agree only that beginning at least in May 2007, U.S. Data filled orders for timeshare data from its own in-house timeshare database that it had created. U.S. Data contends that it created its own database of timeshare owners beginning in August 2006 with its purchase of 1.3 million names from third parties. RealSource asserts that U.S. Data's database was merely a copy of RealSource's database, which U.S. Data created by retaining and then merging all of the data it had purchased from RealSource over the years. Two former U.S. Data employees, Nicole Short List and Laura Acord, testified that they were directed to merge the 526,750 names from RealSource into a single database for U.S. Data's use. In May 2007, Ms. Short List contacted RealSource's CEO Trenton Martin to tell him that U.S. Data was misusing RealSource's data. On September 7, 2007, RealSource sent U.S. Data a Notice of Termination pursuant to the terms of the NDA. RealSource contends that it terminated the agreement because U.S. Data had breached the LOAs by reusing timeshare data.

U.S. Data counters that the real reason RealSource terminated the NDA was to allow RealSource to sell directly to U.S. Data's client, Timeshare Relief. RealSource first acknowledged knowing that Timeshare Relief was one of U.S. Data's clients in an email dated July 17, 2006. RealSource again acknowledged knowing that Timeshare Relief was a client on June 25, 2007 when one of RealSource's owners, Karolyn Tincher, sent an email to U.S. Data's

3

president Jeff Herdzina asking if Timeshare Relief was U.S. Data's largest client. Herdzina responded affirmatively. According to U.S. Data, once RealSource knew about Timeshare Relief, it sought to cut out U.S. Data as a middleman and sell directly to Timeshare Relief. In support, U.S. Data notes that in approximately the late summer of 2007, the volume of orders Timeshare Relief placed with U.S. Data began to drop. Around that same time, Mr. Herdzina asked Mr. Martin if RealSource had been in contact with Timeshare Relief, which Mr. Martin denied. Then in October 2007, Mr. Martin told one of the owners of Timeshare Relief that U.S. Data had stolen RealSource's timeshare database.

On October 23, 2007, Timeshare Relief placed its last order with U.S. Data. Rather than order from U.S. Data, Timeshare Relief continued ordering data from another middleman of RealSource, D&S Leads, from which it had first ordered in August 2007. RealSource knew that the data it sold D&S Leads was for Timeshare Relief. In January 2008, Timeshare Relief began to order directly from RealSource. As a result of these events, the parties have brought numerous claims against each other.

U.S. Data filed its initial complaint in February 2008, and RealSource filed a counterclaim in response. (R. 1, Complaint; R. 14, Counterclaim.) In its Third Amended Complaint, U.S. Data alleged the following: breach of contract against RealSource (Count I); tortious interference with prospective economic advantage against RealSource, Priority Direct, and D&S Leads (Count II); conversion against RealSource, Priority Direct, and D&S Leads (Count III); Unjust Enrichment against Priority Direct and D&S Leads (Count IV); and conspiracy to tortiously interfere with prospective economic advantage against RealSource, Priority Direct, and D&S Leads (Count V). In Realsource's amended counterclaim, it alleged the following: breach of contract (Count I); and misappropriation/unfair competition (Count II).

4

The only claims that survived summary judgment were U.S. Data's claim for breach of contract against RealSource (Count I) and RealSource's counterclaim for breach of contract (Count I). The parties began a jury trial on these claims on September 16, 2013. On September 24, 2013, the jury returned a verdict in favor of RealSource on U.S. Data's claim and in favor of U.S. Data on RealSource's counterclaim. The Court entered judgment accordingly on the same date. (R. 275.)

## LEGAL STANDARD

### I.  Judgment as a Matter of Law Pursuant to Rule 50(b)

When ruling on a motion for judgment as a matter of law following a jury verdict, courts do not re-weigh the evidence presented at trial or make credibility determinations.[2] *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). "Once a jury has spoken, we are obliged to construe the facts in favor of the parties who prevailed under the verdict." *Tate v. Executive Mgmt. Servs., Inc.*, 546 F.3d 528, 531 (7th Cir. 2008) (citations and quotations omitted). Considering the totality of the evidence, courts determine whether the jury was presented with a "legally sufficient amount of evidence from which it could reasonably derive its verdict." *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000). In assessing a motion under Rule 50(b), courts view the evidence and all reasonable inferences in a light most favorable to the party who prevailed under the verdict

---

[2] U.S. Data argues that in diversity cases, courts apply the forum state's standard of review when considering whether a party deserves judgment notwithstanding the verdict. (U.S. Data Mot. at 2-3.) This is wrong. The Seventh Circuit applies the federal reasonable-person standard in both diversity and federal question cases. *Walter v. Bruhn*, 40 Fed. Appx. 244, 246 (7th Cir. 2002) ("Although courts in this circuit formerly applied state standards to the determination of mid-trial and post-trial motions regarding the sufficiency of the evidence, we have since adopted the federal reasonable-person standard across the board: pre-trial, mid-trial, post-trial, and on appeal, for evaluation both the merits and the quantum of relief, in diversity as well as federal question cases.") (quotations omitted) (citing *To-Am Equip. Co., Inc. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 152 F.3d 658, 664 (7th Cir. 1998) and *Mayer v. Gary Partners & Co., Ltd.*, 29 F.3d 330, 335 (7th Cir. 1994)).

5

and "do not make credibility determinations or weigh the evidence." *Tate*, 546 F.3d at 532; *Reeves*, 530 U.S. at 150-51, 120 S. Ct. 2097; *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 7211 (7th Cir. 2003). As the Seventh Circuit has noted, the standard is steep and "a verdict will be set aside as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (citations omitted).

## II. Motion for a New Trial

The parties face a heavy burden under Rule 59(a) of establishing the need for a new trial. *See Marcus & Millichap Inv. Servs. of Chicago, Inc. v. Sekulovski*, 639 F.3d 301, 313-14 (7th Cir. 2011) (Stating that "movants bear a particularly heavy burden because a court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict.") (Citing *Lewis v. City of Chicago*, 590 F.3d 427, 444 (7th Cir. 2009)). "A court may only order a new trial if the jury's verdict is against the manifest weight of the evidence, or if for other reasons the trial was not fair to the moving party." *Willis*, 687 F.3d at 836 (quotations omitted). "A new trial should be granted, however, only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Whitehead v. Bond*, 680 F.3d 919, 927-28 (7th Cir. 2012) (quotations omitted). Seventh Circuit precedent instructs that courts are to view the evidence in the light most favorable to the non-moving party on a Rule 59(a) motion. *See, e.g., Wipf v. Kowalski*, 519 F. 3d 380, 384 (7th Cir. 2008) (citing *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004)); *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1079 (7th Cir. 1998) (citing *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir. 1991)).

6

District courts have wide discretion in determining whether to grant a motion for a new trial, *Mejia v. Cook County, Illinois*, 650 F.3d 631, 634 (7th Cir. 2011), but they must give deference to the jury's conclusions. *Id.* at 633 n. 1. "This deference is encompassed within the manifest weight standard, which balances 'a decent respect for the collective wisdom of the jury' against a duty not to 'approve miscarriage of justice.'" *Id.* (citing 11 Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 2806, at 74 (2d ed. 1995)). "In cases involving simple issues but highly disputed facts …, greater deference should be afforded to the jury's verdict than in cases involving complex issues with facts not highly disputed." *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995) (citations omitted). The Seventh Circuit has cautioned that while the district court judge "has a responsibility for the result [of the trial] no less than the jury, he should not set the verdict aside as against the weight of the evidence merely because, if he had acted as trier of the fact, he would have reached a different result; and in that sense he does not act as a 13th juror in approving or disapproving the verdict." *Id.* at 315.

## ANALYSIS

**I.     U.S. Data's Motion**

    **A.     Motion for Judgment Notwithstanding the Verdict**

In its Rule 59 motion for a new trial, U.S. Data moves for a judgment notwithstanding the jury's verdict as to Count I of its Third Amended Complaint. (R. 278.) This type of motion is correctly brought as a Rule 50 motion for judgment as a matter of law. U.S. Data's procedural error, however, is merely formal, and the Court treats the present motion as a motion for judgment as a matter of law in accordance with Rule 50. *See* Fed. R. Civ. P. 50(b), comm. note (1991 amend.) ("If a motion is denominated a motion for directed verdict or for judgment

notwithstanding the verdict, the party's error is merely formal. Such a motion should be treated as a motion for judgment as a matter of law in accordance with this rule").

Rule 50(a)(2) addresses when a motion for judgment as a matter of law may be brought and states that one "may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). Rule 50(b) addresses "renewed" motions for judgment as a matter of law after trial, and states:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment – or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged – the movant may file a renewed motion for judgment as a matter of law and may include an alternate or joint request for new trial under Rule 59.

Fed. R. Civ. P. 50(b). "Because the Rule 50(b) motion is only a renewal of the pre-verdict motion, it can be granted only on grounds advanced in the pre-verdict motion." *Passananti v. Cook Cnty.*, 689 F.3d 655, 660 (7th Cir. 2012) (quoting Fed. R. Civ. P. 50(b), comm. note (2006 amend.)). *See also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n. 5, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008) (stating that "a motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury") While U.S. Data did move for judgment as a matter of law at the close of RealSource's case, it only moved for judgment with respect to RealSource's breach of contract counterclaim:

> Ms. Bentley: Absolutely, your honor. Just very briefly with respect to defendant's counterclaim, feel that judgment is appropriate as a matter of law under Rule 50 because the defendant has provided no basis whatsoever for its damages in this case. They have provided no time parameter for what they expect for damages. They provided no amount of damages. They have also provided no basis to establish any other – any timeshare customers whatsoever, there's no evidence in the record that they have rented to any other timeshare customers. So, they haven't identified parameters for

> damages, nor because of the testimony in the record from Brian Rich, as well as Trent Martin that no seeding has taken place, they cannot establish in any data that RealSource provided to U.S. Data pursuant to the LOAs was rent more than once.

The Court: Okay. Thank you. I will take it under advisement.

Ms. Bentley: Thank you.

As the record clearly reflects, U.S. Data did not move for judgment as a matter of law on Count I of its own Third Amended Complaint. Rather, it moved for a Rule 50(a) judgment as a matter of law only on RealSource's counterclaim. Further, when it brought this motion, it did so only on the grounds that RealSource failed to provide evidence of its damages. The Court therefore denies U.S. Data's Rule 50(b) motion for judgment as a matter of law as to Count I of its Third Amended Complaint.

> **B.    The Court's Denial of U.S. Data's Motion for Leave to File a Renewed Motion for Summary Judgment**

In May 2012, U.S. Data filed its motion for summary judgment (R. 178), on which the prior judge ruled. (192.) U.S. Data then filed a motion to reconsider the entry of summary judgment in Defendant's favor on Counts II and V of its Third Amended Complaint. (R. 204.) Approximately two and a half weeks before the start of trial, U.S. Data filed a trial brief addressing whether the NDA and the LOAs are separate and distinct. (R. 242.) In that brief, U.S. Data again requested leave to file a renewed motion for summary judgment after the Court ruled on its trial brief. The Court ruled in favor of U.S. Data and concluded as a matter of law based on the plain meaning of the contracts that the NDA and the LOAs are separate and distinct contracts. (R. 259, Order.) Addressing U.S. Data's request for leave to file a renewed motion for summary judgment, the Court stated that it "denies this eleventh hour request in part because the Court's determination that the NDA and LOAs are not a single contract is consistent with U.S. Data's position throughout the litigation and does not warrant a renewed motion." (*Id*. at

4.) That was true two weeks before trial and it is true now. *See Aldridge v. Forest River, Inc.*, 635 F.3d 870, 874 (7th Cir. 2011) (stating that district court judges "possess great authority to manage their caseload").

U.S. Data, however, now argues that the Court's denial of its motion for leave to file a renewed motion for summary judgment was improper because the Court's ruling on the "single contract" issue "effectively eliminated all of the issues Judge Manning preserved for submission to a factfinder at trial." (U.S. Data Mot. at 4.) This argument effectively amounts to an untimely motion to reconsider the Court's previous rulings. U.S. Data, however, has not met the standard for reconsideration of the Court's prior rulings. *See Broaddus v. Shields*, 665 F.3d 846, 860 (7th Cir. 2011), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 n. 1 (7th Cir. 2013) ("It is well established that a motion to reconsider is only appropriate where a court has misunderstood a party, where the court has made a decision outside the adversarial issues presented to the court by the parties, where the court has made an error of apprehension (not of reasoning), where a significant change in the law has occurred, or where significant new facts have been discovered") (citing *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)). Moreover, U.S. Data does not even specify the type of relief it seeks on this issue. It merely states that it "should have been afforded the opportunity to file a renewed motion for summary judgment after the Court issued its ruling on the 'single contract issue.'" (*Id*. at 9.)

To the extent that U.S. Data's argument is that the Court's ruling on the "single contract issue" and the evidence presented at trial entitle it to judgment as a matter of law, that argument also fails. As explained above, U.S. Data moved for judgment as a matter of law only on RealSource's counterclaim. Because the Rule 50(b) motion is only a renewal of the pre-verdict

motion, and can be granted only on grounds advanced in the pre-verdict motion, the Court cannot consider this argument. *Passananti,* 689 F.3d at 660.

      **C.**      **The Issue of Whether "Confidential Information" as Set Forth in the NDA Included RealSource's Data is a Question of Law, Not of Fact**

U.S. Data contends that at trial, RealSource argued in defense that U.S. Data did not fully perform under the NDA because it misused "Confidential Information" as set forth in the NDA. According to U.S. Data, RealSource further asserted that "Confidential Information" included the rental of timeshare lists that RealSource created and provided to U.S. Data, and that U.S. Data breached the NDA when it used the timeshare lists to verify or validate against its own in-house list. U.S. Data argues that the plain language of the NDA renders this issue a matter of law and that this issue should never have gone to the jury. Again, U.S. Data's argument here – that the question of whether it fully performed under the NDA was a question of law that should not have gone to the jury – is a Rule 50(b) motion for judgment as a matter of law.[3] As explained above, U.S. Data cannot raise that argument here because its Rule 50(a) motion for judgment as a matter of law at the close of evidence addressed only RealSource's counterclaim.

To the extent that this argument is part of a motion for a new trial, that argument also fails. U.S. Data asserts that RealSource's President "repeatedly acknowledged at trial in this matter that the database rentals contained no [] restrictive legend" as required by the NDA. (U.S. Data Mot. at 7.) U.S. Data also contends that RealSource argued for the first time at trial that

---

[3] The entire thrust of U.S. Data's motion is that it is entitled to a judgment notwithstanding the verdict. Indeed, it even states:

> The fundamental issue upon which U.S. Data bases its motion for new trial/judgment notwithstanding the verdict, is whether or not Confidential Information as defined in the NDA included the data transferred from RealSource to U.S. Data with every rental under the LOAs at issue in RealSource's Counterclaim. This issue is one of contract interpretation, and as such, is within the purview of the Court, rather than the jury, to decide.

(U.S. Data Reply at 4.)

11

U.S. Data failed to perform under the NDA because of its alleged misuse of the database lists. This argument, U.S. Data asserts, "was clearly introduced to confuse the jury and combine [U.S. Data's] obligations under the two contracts," despite the fact that the Court rejected this approach when it ruled on the "single contract issue" prior to trial. (*Id.*)

As the Court noted in its pre-trial order on the "single contracts issue," RealSource has argued that NDA and the LOAs had a shared single purpose: "the protection of the parties' information." (R. 259 at 3.) While the Court did not find this argument persuasive on the issue of whether the NDA and the LOAs should be construed as a single contract, U.S. Data is wrong in arguing that RealSource raised this issue for the first time at trial. Indeed, the jury instructions in this case state that RealSource denies that U.S. Data performed its obligations under the NDA. (R. 273, Jury Instructions at 14.)

In response, RealSource makes several assertions. First, it argues that witnesses for both RealSource and U.S. Data testified that the purpose of the NDA was to facilitate the ability of the parties to engage in the renting of RealSource's data to U.S. Data's customers. Next, it contends that a U.S. Data employee admitted that U.S. Data used RealSource's mailing list for other purposes, and that this evidence established that U.S. Data did not fulfill its duties under the NDA. Finally, it asserts that there was more than sufficient evidence to establish that the RealSource mailing list was properly identified as confidential information under the NDA. This evidence included the testimony of two U.S. Data witnesses that the mailing list was confidential information, and of a RealSource witness that RealSource transmitted the data with a confidential legend.

Part of the problem for the Court is that both parties failed to appropriately cite the record. Rather, they just baldly assert their recollection of the evidence that came in at trial. In

fact, U.S. Data even acknowledged that "it is difficult to reconstruct the court record without a transcript of proceedings and without specific reference to testimony." (R. 283, U.S. Data Reply at 3.) The Court certainly agrees. While neither party presents overwhelming evidence, they do establish that whether U.S. Data proved the necessary elements for its breach of contract claim was a question of fact for the jury to decide. In light of the competing evidence presented at trial, there was a reasonable basis for the jury to conclude that U.S. Data did not prove all of the elements of its breach of contract claim. *See Lowe v. Consol. Freightways of Delaware, Inc.*, 177 F.3d 640, 643 (7th Cir. 1999) ("It's the jury's job – not the district court's job or the job of a panel of appellate judges – to figure out who's telling the truth. The fact that [the losing party] presented evidence that is inconsistent with the jury's verdict does not mean that the verdict should be reversed.").

> **D.      Whether RealSource's President's Alleged Admission that RealSource Violated the Non-Circumvention Clause Entitles U.S. Data to Judgment Notwithstanding the Verdict in this Matter**

U.S. Data contends that the Court previously ruled that the LOAs governed the ways in which U.S. Data could use RealSource's data. In light of this ruling, U.S. Data argues that the jury's finding in favor of U.S. Data on RealSource's counterclaim supports the entry of judgment in its favor on Count I of its Third Amended Complaint. (U.S. Data Mot. at 8.)

This claim would be more properly brought as a claim for a new trial, since it is based on the jury's verdict. U.S. Data, however, argues only that the jury's verdict on RealSource's counterclaim entitles it to judgment notwithstanding the verdict on its own claim for breach of contract. For the reasons already discussed above, U.S. Data has waived its right to judgment notwithstanding the verdict because it did not move at the close of evidence for a judgment as a matter of law on its own claim.

Even if U.S. Data had not waived this argument, it would fail. U.S. Data's reliance on a pretrial ruling that the two contracts at issue did not constitute a single contract is irrelevant to the jury's determination that U.S. Data did not prove that RealSource breached the NDA. By definition, U.S. Data's claim for breach of contract is separate and apart from RealSource's counterclaim and it requires proof of separate elements. To prevail on its claim, U.S. Data had to prove that (1) it performed its obligations under the NDA; (2) RealSource failed to perform its obligations under the NDA; and (3) damages. (Jury Instructions at 14.) In light of the evidence presented at trial, it was not unreasonable for the jury to conclude that U.S. Data did not prove its claim for breach of contract.

### III. RealSource's Motion for a New Trial on Its Counterclaim for Breach of Contract

RealSource argues that the jury's verdict in favor of U.S. Data on RealSource's counterclaim for breach of contract was against the weight of the evidence. RealSource contends that the "uncontroverted evidence" established that it performed its only obligation under the LOAs by delivering the requested data to U.S. Data, and U.S. Data breached the LOAs by using RealSource's data for purposes other than a one-time rental to an end user. (R. 276, RealSource Mot. ¶¶ 10-12.) In support of its argument that the evidence established U.S. Data's breach, RealSource contends that (1) a U.S. Data employee, Erich Kaminsky, admitted in his deposition "that he suppressed other mailing lists against RealSource's list;" (2) U.S. Data's President, Jeff Herdzina, was aware that a U.S. Data employee ordered data from RealSource for the purpose of completing U.S. Data's in-house timeshare file and not to deliver to an end user; (3) a U.S. Data employee, Ms. Short List admitted that she lied to RealSource to obtain this list of names; and (4) two U.S. Data employees, Ms. Short List and Ms. Acord, testified that they subsequently used U.S. Data's in-house timeshare file to fill orders for U.S. Data's customers from April 2007

through June 2007.  (*Id.* ¶¶ 12-14.)  Finally, RealSource argues that U.S. Data failed to contradict this evidence.  (*Id.* ¶ 15.)

As the Court previously noted, both parties' arguments are weakened by their failure to appropriately cite the record.  Regardless of that shortcoming, RealSource still does not present a compelling argument that it is entitled to a new trial.  RealSource did, as U.S. Data asserts, cherry-pick its most favorable testimony, which was not "uncontroverted" as RealSource contends.  In response to the evidence that RealSource identified, U.S. Data submits that (1) Mr. Kaminsky testified at trial that he used the wrong word in his deposition when he said that U.S. Data "suppressed" their data against RealSource's data; (2) Mr. Herdzina testified that he never directed Ms. Short List or Ms. Acord to fill orders more than once with RealSource timeshare data; (3) Mr. Kaminsky testified that it would be almost impossible to fulfill orders in the way that Ms. Short List and Ms. Acord testified they did; and (4) Mr. Herdzina and Mr. Kaminsky testified that they began building their own timeshare database in August 2006, well before the time when Ms. Short List and Ms. Acord testified that they filled customer orders in 2007.

This contradictory evidence establishes that there was a clear question of fact for the jury to determine.  Viewing the evidence in the light most favorable to the non-moving party, it was not unreasonable for the jury to rule in favor of U.S. Data.  *See Westchester Fire Ins. Co. v. Gen. Star Indem. Co.*, 183 F.3d 578, 582 (7th Cir. 1999) (a court "will not overturn a jury's verdict as long as there is a reasonable basis in the record to support it.").  As for RealSource's repeated reliance on the testimony of Ms. Short List and Ms. Acord, RealSource ignores U.S. Data's effective cross-examination of them.  Further, the jury did not have to accept as true their testimony.  *Lowe*, 177 F.3d at 642-43 ("the fact that [the defendant] presented evidence that is inconsistent with the jury's verdict does not mean that the verdict should be reversed … The jury

was there; it weighed the witnesses' credibility, considered the evidence, and reached a supportable conclusion")). RealSource has not presented any evidence that the jury's verdict resulted in a miscarriage of justice, cries out to be overturned, or shocks the conscience, and it is not entitled to a new trial on its counterclaim. *See Whitehead* 680 F.3d at 927-28.

## CONCLUSION

After reviewing both parties' arguments and the evidence upon which each party relies, the jury's verdict was not against the manifest weight of the evidence. Accordingly, the Court denies U.S. Data's motion for judgment notwithstanding the verdict or, in the alternative, a new trial and denies RealSource's motion for a new trial.

Dated: July 23, 2014        ENTERED:

                                            AMY J. ST. EVE
                                            United States District Court Judge